**JO ANNE HANSEL GARDNER,** Plaintiff–Appellant, v. **TIMOTHY LYNN GARDNER,** Defendant–Appellee

NO. 14260

(FC–D NO. 88–0385(2))

APRIL 24, 1991

BURNS, C.J., HEEN, AND TANAKA, JJ.

OPINION OF THE COURT BY BURNS, C.J.

Plaintiff Jo Anne Hansel Gardner (Wife) appeals the part of the family court's November 3, 1989 Divorce Decree that divides and distributes the property and debts of the parties. Defendant Timothy Lynn Gardner (Husband) cross–appeals the family court's February 7, 1990 Order Denying Defendant's Motion for Costs and Attorney Fees (February 7, 1990 Order). We (1) remand for further proceedings with respect to the division and distribution

of the property and debts part of the November 3, 1989 Divorce Decree; and (2) vacate the February 7, 1990 Order.

## FACTS

Husband was born on April 9, 1942. Wife was born on August 4, 1946.

On October 1, 1980, Husband contracted to sell his property at 1260 Makawao Avenue. In return he acquired the legal right to be paid $34,574.81 at closing on December 8, 1980, $20,000.00 on December 23, 1981, and $8,000.00 on December 23, 1982. Husband received all payments as scheduled.

After Husband contracted to sell 1260 Makawao Avenue but before the sale closed, he and Wife were married. The date of marriage (DOM) was November 16, 1980. The couple's son was born on June 8, 1981.

On February 20, 1981, Husband was the highest bidder at a foreclosure auction sale of 5 Kaiholo Place. He acquired title on April 1, 1981. A mortgage supplied $60,300.00 and Husband supplied $9,159.92 of the purchase price. Husband used the purchase of 5 Kaiholo Place to defer the taxable gain on his sale of 1260 Makawao Avenue.

On March 5, 1988, Husband and Wife finally separated in contemplation of divorce.

On May 24, 1988, Husband sold 5 Kaiholo Place. As a condition of the sale, he spent $2,693.00 earned after March 5, 1988, to complete a bedroom addition. The sale netted $72,297.62 in cash. Husband used $14,265.85 of the proceeds to pay off various debts.

On July 21, 1988, Husband purchased 665 Hoene Street. A mortgage supplied $184,000.00 and Husband supplied $54,497.00. Husband used the purchase of 665 Hoene Street to defer the taxable gain on his sales of 1260 Makawao Avenue and 5 Kaiholo Place.

Wife was not liable on any of the mortgages of Husband's real properties.

On September 30, 1988, Wife filed her Complaint for Divorce in this case.

The date of the conclusion of the evidentiary part of the trial (DOCOEPOT) was August 11, 1989. On DOCOEPOT the gross market value of 665 Hoene Street was approximately $255,000.00. There is no evidence that the $184,000.00 mortgage on it had changed significantly. Therefore, its net market value (NMV) was approximately $71,000.00.

On June 30, 1988, Husband's personal debt at the Kula Community Federal Credit Union was $2,255.34.

Husband was a tax consultant and a realtor. At DOCOEPOT Husband's average monthly gross income was $2,000.00. Wife was the manager of Island Heritage Collection, a wholesale distributor of paper products. She was also a part–time model. Her total monthly gross income was $1,938.16.

The November 3, 1989 Divorce Decree awarded 665 Hoene Street to Husband and did not require him to pay any compensating amount to Wife.

## DISCUSSION
### I.

Hawaii divorce law generally applies partnership principles. *Myers v. Myers*, 70 Haw. 143, 154, 764 P.2d 1237, 1244 (1988). Under general partnership law, "each partner is entitled to be repaid his contributions to the partnership property, whether made by way of capital or advances." 59A Am. Jur. 2d *Partnership* § 476 (1987) (footnotes omitted). Absent a legally permissible and binding partnership agreement to the contrary, "partners share equally in the profits of their partnership, even though they may have contributed unequally to capital or services." *Id.* § 469 (footnotes omitted). Hawaii partnership law provides in relevant part as follows:

**Rules determining rights and duties of partners.**
The rights and duties of the partners in relation to the partnership shall be determined, subject to any agreement between them, by the following rules:

> (a)   Each partner shall be repaid the partner's contributions, whether by way of capital or advances to the partnership property and share equally in the profits and surplus remaining after all liabilities, including those to partners, are satisfied; and must contribute towards the losses, whether of capital or otherwise, sustained by the partnership according to the partner's share in the profits.

Hawaii Revised Statutes (HRS) § 425–118(a) (1985).

In *Malek v. Malek*, 7 Haw. App. 377, 380–81 n.1, 768 P.2d 243, 246–47 n.1 (1989), we defined five categories of net market values (NMVs) in divorce cases. They are as follows:

> Category 1.   The net market value (NMV), plus or minus, of all property separately owned by one spouse on the date of marriage (DOM) but excluding the NMV attributable to property that is subsequently legally gifted by the owner to the other spouse, to both spouses, or to a third party.
>
> Category 2.   The increase in the NMV of all property whose NMV on the DOM is included in category 1 and that the owner separately owns continuously from the DOM to the DOCOEPOT [date of the conclusion of the evidentiary part of the trial].
>
> Category 3.   The date–of–acquisition NMV, plus or minus, of property separately acquired by gift or inheritance during the marriage but excluding the NMV attributable to property that is subsequently legally gifted by the owner to the other spouse, to both spouses, or to a third party.

Category 4. The increase in the NMV of all property whose NMV on the date of acquisition during the marriage is included in category 3 and that the owner separately owns continuously from the date of acquisition to the DOCOEPOT.

Category 5. The difference between the NMVs, plus or minus, of all property owned by one or both of the spouses on the DOCOEPOT minus the NMVs, plus or minus, includable in categories 1, 2, 3 and 4.

The NMVs in Categories 1 and 3 are the parties' capital contributions to the marital partnership. The NMVs in Categories 2 and 4 are the during–the–marriage increase in the NMVs of the Categories 1 and 3 properties owned at DOCOEPOT. Category 5 is the DOCOEPOT NMV in excess of the Categories 1, 2, 3, and 4 NMVs. In other words, Category 5 is the net profit or loss of the marital partnership after deducting the partners' capital contributions and the during–the–marriage increase in the NMV of property that was a capital contribution to the partnership and is still owned at DOCOEPOT.

When categorizing the DOCOEPOT NMVs divisible and distributable in divorce cases, the following determinations are involved: (a) a determination of all the NMVs, plus and minus, owned by one or both parties at DOCOEPOT; (b) a determination of each party's Categories 1, 2, 3, and 4 NMVs; and (c) a determination of the total category 5 NMV, plus or minus, which is the difference between the total NMV of (a) and the total NMV of (b).

In *Woodworth v. Woodworth*, 7 Haw. App. 11, 17, 740 P.2d 36, 41 (1987), *overruled in part, Myers v. Myers*, 70 Haw. 143, 764 P.2d 1237 (1988), we specified uniform starting points (USPs) for, and uniform maximum limits on, the division and distribution of the five categories of NMVs as follows:

The USP for dividing the NMVs under categories 1 and 3 is 100 percent to the legal owner spouse and zero percent

to the nonowner spouse. The USP for dividing the NMVs under categories 2 and 4 is 75 percent to the legal owner spouse and 25 percent to the nonowner spouse. The USP for dividing the NMVs under category 5 is 50 percent to the husband and 50 percent to the wife. . . .

No more than 50 percent of the NMVs in categories 1, 2, 3, or 4 may be awarded to the nonowner spouse. . . . There is no maximum limit to the category 5 NMVs that may be awarded to a husband or a wife.

In *Hashimoto v. Hashimoto*, 6 Haw. App. 424, 426–27, 725 P.2d 520, 522–23 (1986) (footnotes omitted), we explained that uniform starting points are merely points

from which to commence equitable distribution analysis and application of statutory and case law mandates. . . .

The need for such "uniform starting points" is obvious. If different family court judges commence deciding in what proportion to equitably divide the value of the property from different starting points, which could range from a 100–0 split to a 0–100 split, then their awards will be equally diverse. There will be no uniformity, stability, clarity, or predictability. The ultimate decision will depend less on the facts and the law and more on who is the judge assigned to hear and decide the case. Since the standard of appellate review is the abuse of discretion standard, appellate courts will be relatively powerless to control or remedy the problem.

If family court judges are required to commence deciding in what proportion to equitably divide the value of the property from a uniform starting point, and to identify each of the factors that cause them to deviate and award a different proportion, then their decisions will be more uniform and predictable and the process of

appellate review under the abuse of discretion standard will be greatly facilitated.

In *Muraoka v. Muraoka*, 7 Haw. App. 432, 438–39, 776 P.2d 418, 422 (1989), we specified the decisional process as follows:

In contested divorce cases where the family court is dividing and distributing the assets and debts of the parties, the authorized decisional process is a three–step process as follows: First, based on the stipulations of the parties and the findings of fact, the family court should prepare a USP list of (a) the various items of plus and minus value being divided and distributed (b) showing their respective USP categorizations and (c) how they would be divided and distributed to the parties under the applicable USPs.

Second, the family court should prepare two lists in the same form as step one's USP list showing the position of each of the parties with respect to the division and distribution of each of the various items of plus and minus value.

Third, as stated by this court in *Woodworth v. Woodworth*, 7 Haw. App. [11], 740 P.2d 36 (1987), the family court "then . . . must exercise its equitable discretion under applicable case law and Hawaii Revised Statutes § 580–47(a) (1985)." 7 Haw. App. at [19], 740 P.2d at 42.

\* \* \*

If the family court's division and distribution of the assets and debts of the parties is appealed and the appellant is dissatisfied because the family court's division and distribution materially differs from the USP, then the family court must specify the factual considerations upon which the difference is based. If the appellant is dissatisfied because the family court's division and distribution does

not materially differ from the USP in the manner requested at the trial by the appellant, then the family court must specify the factual considerations upon which the denial of the requested difference is based.

In *Bennett v. Bennett*, 8 Haw. App. 415, 421, 424–25, 807 P.2d 597, 601, 603 (1991), we stated:

> The process we have developed is designed to standardize and facilitate the factual analysis, facilitate settlements, identify the reasons for a particular decision, facilitate appellate review, facilitate the continued case–by–case development of express and uniform ranges of choice applicable statewide in similar fact situations, and bring as much statewide consistency, uniformity, and predictability as is possible to family court decisions dividing and distributing property in divorce cases. This process is designed and intended to replace the prior system where the family court decided and the appellate court reviewed each case on an ad hoc basis and without expressly identifying all the relevant facts and specific reasons for the decision.
>
> * * *
>
> In our view, the uniform process we have developed is much better than the prior ad hoc process and is accomplishing its purposes outlined above. If there is a problem with the uniform process, it is with its implementation, not with the process itself. The appropriate solution to an implementation problem is to require proper implementation, not to discontinue the process.
>
> Therefore, we reemphasize that the uniform process is only a process. USPs are only starting points. There are currently only a few limits on the family court's range of choice. Subject to these few limits, the family court currently has, and must knowledgeably exercise, a wide

range of choice and equitable discretion when deciding how to divide and distribute property in divorce cases.

In his concurring opinion in *Bennett*, 8 Haw. App. at 430, 807 P.2d at 605, Judge Heen stated:

> Although each family court judge may view the facts of each divorce case differently, that is exactly what the statute allows them to do. The statute is based on a sound realization that there cannot be predictability in marital property splits because no two cases involve the same set of facts. It is up to the appellate courts to determine whether the result the family court reaches is within the bounds of reason, not whether the individual judge had started from the same point. Facilitation of that review is not the purpose of HRS § 580–47(a).
>
> The standard of review in discretion cases is unquestionably of judicial origin as the majority points out. However, the USP overlook the fact that the legislature has accorded the family court a wide discretion not only to reach a just and equitable result, but also to determine, based on the facts in each case, where they will begin applying the factors of HRS § 580–47(a). In my view, the USP represent a restrictive approach to the division of marital property which the legislature did not intend and which we are powerless to impose, even under the guise of appellate review.

In other words, Judge Heen concludes that we are powerless to impose uniform starting points. We can require family court judges to categorize the DOCOEPOT NMVs and to explain why they did not agree with the appellant's position but we must allow them to commence their equitable distribution analysis at any point(s) they choose. Family court judges may or may not start from the same point(s) in similar cases.

On the other hand, Judge Tanaka and I conclude that as an appellate court we have the power to require all family court judges to start their equitable distribution analysis from uniform starting points. The primary purpose of categorization is to facilitate the uniform starting points and the uniform decisional process. If there can be no uniform starting points, then categorization and the uniform decisional process are exercises without any useful or meaningful purpose. Therefore, we reaffirm the categories, the uniform starting points, and the *Muraoka* decisional process.

## II.

The October 12, 1989 Findings of Fact and Conclusions of Law state in relevant part as follows:

### [FINDINGS OF FACT]

8. As a result of the capital gain realized on the Makawao property, Husband had a tax obligation of $9,044.00. Husband deferred this capital gain tax by successfully bidding at a foreclosure sale auction for [5 Kaiholo Place]. . . . (Exhibit 10)

\* \* \*

10. Shortly after the close of the sale of [5 Kaiholo Place], Husband hired a contractor and began renovations of the [5 Kaiholo Place]. [5 Kaiholo Place] was in a poor state of repair. (Exhibtis [sic] E, F, and G) After several months, the property was completely renovated. (Exhibits H, I, and J)

11. In April of 1981, Husband secured a second mortgage on [5 Kaiholo Place] with Bank of Hawaii in the amount of $20,000.00. The funds were used in the renovation of [5 Kaiholo Place].

12. Upon completion of the renovations of [5 Kaiholo Place], Husband had invested approximately

$110,000.00 in the property including $60,300.00 from Pioneer Federal from the first mortgage, $9,159.92 from the Makawao proceeds for the downpayment and closing costs, $20,000.00 from the second mortgage with Bank of Hawaii, and approximately an additional $20,240.00 from the proceeds from the Makawao sale to complete the renovation. The balance of the money received from the Makawao sale was used for mortgage payments and living expenses.

13. On or about May 28, 1982, Husband refinanced and paid off the balance on the second mortgage. He entered into a new second mortgage for $40,000.00. The $20,513.50 received from the refinanced second mortgage, which was in Husband's name alone, was deposited into Husband's checking account. Husband used these funds for joint living expenses. (Exhibit 9)

14. On or about May 13, 1983, Husband refinanced the mortgages on the property. He paid off the first mortgage of $61,209.93, the second mortgage to Bank of Hawaii in the amount of $40,017.09, and received $7,929.62 in cash which he used for joint living expenses. The total refinancing was for $112,500.00. (Exhibit 8)

15. In 1984, as a result of Husband's inability to pay mortgage payments, Pioneer Federal Savings & Loan began foreclosure proceedings on [5 Kaiholo Place]. Husband proceeded to negotiate a work–out with Pioneer and Bank of Hawaii who was an unsecured creditor at that time. As part of the work–out, Husband secured a loan from Maui Petroleum Company in the amount of $10,000.00 which was paid to Pioneer Federal Savings on their mortgages arrearages. On February 6, 1985, Husband consolidated his loans with Bank of Hawaii and gave Bank of Hawaii a third mortgage in the face amount

of approximately $10,101.01. (Exhibit 11) The work-out resulted in lower monthly payments for Husband.

16. In May of 1987, Husband refinanced the first mortgage with Pioneer Federal Savings & Loan to take advantage of lower interest rates. The first mortgage was for the sum of $111,000.00. . . . Bank of Hawaii and Maui Petroleum agreed to subordinate to this new first mortgage. (Exhibits 6 and S)

17. During a portion of the parties' marriage, [5 Kaiholo Place] was rented in long-term rentals and also for vacation rentals. Husband found that he was able to rent the property out for more than it cost him and his family to rent accommodations elsewhere. . . . Prior to the parties' final separation, they did move into [5 Kaiholo Place] in September of 1986 so that Husband could establish it as a primary residence for tax purposes.

\* \* \*

24. As a result of the sale of [5 Kaiholo Place], Husband owes capital gains taxes of $66,728.00.

\* \* \*

29. The appreciation [in the value of 665 Hoene Street] is primarily the result of the improvements made by Husband [to it] consisting of $10,000.00 in landscaping and $2,000.00 in appliances. . . .

\* \* \*

33. [1260 Makawao Avenue, 5 Kaiholo Place,] and the proceeds from each of those properties are not a joint asset. The [665 Hoene Street] property is not a joint asset. All said assets are the separate assets of Husband. . . .

\* \* \*

44. If [665 Hoene Street] were sold today, there would be inadequate funds generated from the sale of [665 Hoene Street] to pay the capital gain taxes.

45. During the marriage, the parties [sic] borrowed from the equity of [5 Kaiholo Place] to such an extent that it depleted the equity of the property so that it was equal to less than the amount due on deferred capital gains. Taking into consideration the capital gains, there is no net appreciation left from Husband's separate properties. ...

46. The evidence from Husband's 1986, 1987, and 1988 tax returns show that his gross income for 1986 was $12,949.00, gross income for 1987 was $22,766.00, and gross income for 1988 was $23,733.00. These figures are consistent and support Husband's testimony that his current average monthly income is $2,000.00 per month.

\* \* \*

## [CONCLUSIONS OF LAW]

4. Taking into consideration the deferred and outstanding Federal and Hawaii tax obligation and the valuation evidence, there is no net appreciation during the marriage on the [5 Kaiholo Place] or net appreciation post–DOFSICOD [date of final separation in contemplation of divorce] on [665 Hoene Street] to be divided by this Court.

5. There was appreciation on [5 Kaiholo Place] during the marriage, however, as a result of the parties' [sic] borrowing the equity from the property during the marriage and using said sums for joint living expenses, there is no net appreciation left to divide between the parties.

6. [1260 Makawao Avenue] is a Category I property and the re–investment of those Category I assets into [5 Kaiholo Place] also results in [5 Kaiholo Place and 665 Hoene Street] being Category I property.

* * *

The family court's December 20, 1989 Order Granting Motion to Amend Findings of Fact and Conclusions of Law enters additional findings in relevant part as follows:

9. Mortgage insurance was purchased on [5 Kaiholo Place]. [Wife] was not put on title to [5 Kaiholo Place] to allow the couple to retain the property via mortgage insurance payments, should [Husband] become disabled and unable to make the mortgage payments.

10. [Husband] told [Wife] that if [Wife] was put on title to the property, the couple would lose the property through foreclosure if [Husband] became ill and had no income; whereas, if title was solely in [Husband's] name, the mortgage insurance would cover the monthly payments.

11. [Wife] relied on [Husband's] advice that it would be in [Wife's] best interest to have the [5 Kaiholo Place] title solely in [Husband's] name.

The first sentence of Finding of Fact 8, Finding of Fact 24, the second sentence of Finding of Fact 45, and all of Conclusions of Law 4, 5, and 6 are wrong. Since Husband did not sell 665 Hoene Street, he did not owe any capital gains taxes. Since he was not planning to sell, all discussion about him owing capital gains taxes was speculation. If Husband did not own 665 Hoene Street and wanted to acquire it, he would have had to pay $255,000.00. He had the exclusive possession and use of a $255,000.00 asset. He had the benefit of a substantial investment that could reasonably be expected to increase in value. Its NMV was the $71,000.00 difference between its $255,000.00 market value and Husband's $184,000.00 debt on it.

Wife does not dispute the family court's division in kind of the other personal property of the parties without valuation. She disputes the division of the following NMVs:

1. The approximate $60,000.00 November 16, 1980 DOM NMV of Husband's legal right from his prior sale of 1260 Makawao Avenue to receive $34,574.81 on December 8, 1980, $20,000.00 on December 23, 1981, and $8,000.00 on December 23, 1982. This amount is approximate because there is no evidence on the record of the DOM NMV of these future receivables.

2. The $71,000.00 DOCOEPOT NMV of 665 Hoene Street.

3. Husband's personal $2,255.34 Credit Union debt at DOCOEPOT.

The categorization of a DOCOEPOT NMV is a question of law. The categorization of Categories 1 and 3 NMVs does not involve tracing beyond the transaction by which the husband or wife acquired the property. The factors that caused the family court in Conclusion of Law 6 to erroneously categorize the DOCOEPOT NMV of 665 Hoene Street as a Category 1 NMV have no bearing on the question of its categorization. If information revealed by tracing is relevant, it is relevant only to the subsequent equitable distribution questions of whether there should be any deviation from the applicable USP for the distribution of the DOCOEPOT NMV and, if so, the amount of the deviation.

The legally correct categorizations of the three NMVs are as follows:

| Item | Husband's Category 1 | Category 5 |
|---|---|---|
| $60,000.00 DOM NMV | $60,000.00 | ($60,000.00) |
| $71,000.00 DOCOEPOT NMV | | 71,000.00 |
| $ 2,255.34 DOCOEPOT debt | | ( 2,255.34) |
| TOTAL | $60,000.00 | $ 8,744.66 |

In this appeal, the issues are whether the family court abused its discretion (1) when it did not deviate from the applicable all–to–Husband USP and awarded Husband all of his approximately $60,000.00 Category 1 NMV; and (2) when it deviated from the

applicable half–to–each–party USP and awarded Husband all of the $8,744.66 Category 5 NMV.

In this case, the family court's decision not to deviate from the all–to–Husband USP applicable to Husband's $60,000.00 Category 1 NMV does not appear to be an abuse of its discretion. The family court's decision to deviate in Husband's favor from the half–to–each–party USP applicable to the $8,744.66 Category 5 NMV may be an abuse of its discretion. In reaching this result the family court (A) erroneously categorized approximately $8,744.66 as a Category 1 NMV and thus began its distribution analysis of that NMV at the wrong USP; (B) overemphasized the fact that title to 5 Kaiholo Place was only in Husband's name and that Wife was not liable on its mortgage; (C) underemphasized the fact that Husband was a marital partner when he acquired, maintained, and improved 5 Kaiholo Place; (D) underemphasized Wife's involvement in the acquisition, maintenance, and improvement of 5 Kaiholo Place during the marital partnership; (E) overemphasized the possible tax consequences if Husband sold 665 Hoene Street; (F) overemphasized Husband's payment of $12,000.00 to improve 665 Hoene Street prior to determining the source and timing of his acquisition of the $12,000.00; and (G) underemphasized the condition in which each party will be left by the divorce.

## III.

On December 15, 1989, Husband's attorney filed a motion for an order requiring Wife to pay him $6,153.00 attorney fees and costs. The motion was based on Rule 68 of the Hawaii Family Court Rules (HFCR) and the attorney's allegation that the November 3, 1989 Divorce Decree was patently not more favorable as a whole to Wife than his March 20, 1989 Offer of Settlement. The family court's February 7, 1990 order denying the motion states merely that "[b]ased upon the arguments of counsel, the file herein,

and the memorandums filed by the parties, the Court hereby denies said motion."

HFCR Rule 68 covers the same subject but is not the same as Rule 68 of the Hawaii Rules of Civil Procedure. HFCR Rule 68 states, in relevant part, as follows:

> If the decree or order finally obtained by the offeree is patently not more favorable as a whole than the offer, the offeree must pay the costs, including reasonable attorney's fees incurred after the making of the offer, unless the court shall specifically determine that such would be inequitable in accordance with the provisions of HRS section 580–47, as amended.

Notwithstanding the specific language of HFCR Rule 68, the family court did not decide (1) whether the November 3, 1989 Divorce Decree was patently not more favorable as a whole to Wife than Husband's March 20, 1989 Offer of Settlement; and (2) whether an order requiring Wife to pay Husband's attorney's fees and costs would be inequitable in accordance with the provisions of HRS § 580–47. The family court cannot decide Husband's December 15, 1989 motion until it expressly decides those questions.

## CONCLUSION

Accordingly, we vacate the following parts of the October 12, 1989 Findings of Fact and Conclusions of Law: the first sentence of Finding of Fact 8, Finding of Fact 24, the second sentence of Finding of Fact 45, and all of Conclusions of Law 4, 5, and 6. We do not disturb any provisions of the November 3, 1989 Divorce Decree. We remand for further consideration of Plaintiff's request that an order be added to the November 3, 1989 Divorce Decree requiring Defendant to pay her an amount of money so as to cause

the division and distribution of property and debts to be equitable. We vacate the February 7, 1990 Order Denying Defendant's Motion for Costs and Attorney Fees.

*Gerald T. Johnson* (Ueoka & Ueoka) on the briefs for plaintiff–appellant.

*Timothy Lynn Gardner*, pro se defendant–appellee, on the brief.

## CONCURRING OPINION OF HEEN, J.

I concur only in the result of this opinion. My reasons for not joining the majority may be found in my concurring opinion in *Bennett v. Bennett*, 8 Haw. App. 415, 807 P.2d 597 (1991).